UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| JANICE I. SMITH | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:08-CV-91-JVB |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

Plaintiff Janice I. Smith seeks judicial review of the final decision of Defendant Michael Astrue, Commissioner of Social Security, who denied her application for Disability Insurance Benefits and Supplemental Security Income Benefits under the Social Security Act. For the following reasons, the Court remands the Commissioner's decision.

**A. Procedural Background**

On January 24, 2005, Plaintiff filed an application for Disability Insurance Benefits, alleging disability since December 31, 1999. Plaintiff's application was denied on March 21, 2005, and again upon reconsideration on May 18, 2005. Plaintiff then filed a timely request for a hearing before an administrative law judge. On May 14, 2007, a hearing was held before Administrative Law Judge Richard C. VerWiebe ("the ALJ") in Fort Wayne, Indiana. Plaintiff appeared with attorney Randal S. Forbes and testified at

the hearing. In a decision dated October 25, 2007, the ALJ denied Plaintiff's application for disability benefits. The ALJ found as follows:

> 1. The claimant last met the insured status requirements of the Social Security Act on December 31, 1999.
>
> 2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of December 31, 1999 through her date last insured of December 31, 1999. (20 CFR 404.1520(b) and 404.1571 *et seq.*).
>
> 3. Through the date last insured, the claimant had the following medically determinable impairments: depression, sleep apnea, acid reflux and restless leg syndrome (20 CFR 404.1520(c)).
>
> 4. Through the date last insured, the claimant did not have an impairment or combination of impairments that significantly limited her ability to perform basic work-related activities for 12 consecutive months; therefore, the claimant did not have a severe impairment or combination of severe impairments (20 CFR 404.1521).
>
> 5. The claimant was not under a disability as defined in the Social Security Act, at any time from December 31, 1999, the alleged onset date, through December 31, 1999, the date last insured (20 CFR 404.1520(c)).

On November 2, 2007, Plaintiff filed a timely request for review with the Appeals Council of the Social Security Administration. However, on February 28, 2008, the Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. On April 9, 2008, Plaintiff filed a timely complaint with this Court.

**B. Factual Background**

**(1)** *Preliminary Events*

Plaintiff was born on April 1, 1967. She completed almost one year of college in the field of elementary education. Between 1990 and 1993, Plaintiff worked at Electri-

Tec. In 1993 and 1994, she worked at QC Onics. She had no income from 1995 through 1998. In October through December 1999, Plaintiff attempted to be a substitute teacher, earning about $623. However, she stopped teaching because she could not handle the physical demands of the job. Before December 1999, Plaintiff had a history of hypothyroidism, hypertension, and obesity.

**(2)** *Medical Evidence*

Treating physician Terry L. Shipe's records indicate that he first treated Plaintiff twenty-four years ago, on July 8, 1985 (Tr. 142). At that time, Plaintiff weighed 207 pounds (Tr. 142).

On June 4, 1986, Plaintiff saw Dr. Shipe for abdominal cramping and slight vaginal bleeding (Tr. 142). A pregnancy test came back positive (Tr. 142), and Dr. Shipe's impression was "pregnancy, vaginal bleeding, increasing pelvic pain, possible appendicitis, pelvic inflammatory disease ("PID"), ectopic pregnancy, threatened miscarriage" (Tr. 142). Plaintiff later suffered an ectopic pregnancy (Tr. 139).

On March 17, 1987, Plaintiff visited Dr. Shipe after experiencing episodes of shakiness between meals (Tr. 141). Dr. Shipe's impression was a questionable hypoglycemia episode (Tr. 141). Plaintiff weighed 248 pounds at the time (Tr. 141).

On June 2, 1987, Plaintiff's weight had increased to 259 pounds (Tr. 141). By March 14, 1988, Plaintiff weighed 280 pounds (Tr. 140).

Plaintiff saw Dr. Shipe again on March 30, 1988 (Tr. 140). She complained of fatigue and problems sleeping (Tr. 140). Dr. Shipe prescribed Halceon to help Plaintiff sleep and kept her off work until April 4, 1988 (Tr. 140).

On September 22, 1988, Plaintiff saw Dr. Shipe claiming that she had experienced spells of shakiness after eating high glucose meals such as pancakes with syrup (Tr. 140). Dr. Shipe discussed his impressions of borderline glucose intolerance and hypoglycemia with Plaintiff (Tr. 140). He instructed her to lose weight and told her that if she were to get pregnant, she would need extra blood sugars to rule out gestational diabetes (Tr. 140).

On November 11, 1988, Plaintiff saw Dr. Shipe for coughing and chest discomfort. She weighed 291 pounds (Tr. 140). Dr. Shipe's impressions were "pharyngitis, bronchitis, costocondritis" (Tr.140).

Plaintiff saw Dr. Shipe on March 13, 1989 for an annual exam. She weighed 286 pounds (Tr. 140). Dr. Shipe encouraged her to go on a weight restriction diet (Tr. 140). On February 12, 1990, Plaintiff's weight was down to 243 pounds, as a result of dieting and exercise (Tr. 139).

On January 29, 1991, Plaintiff tested positive for pregnancy (Tr. 139). Plaintiff's weight was 250 pounds (Tr. 139). Plaintiff eventually underwent a c-section because of failure to progress due to hypertension and had a child (Tr. 136–37). Plaintiff had another positive pregnancy test on June 3, 1993. She weighed 298 pounds (Tr. 137). Dr. Shipe's progress note for March 18, 1994, indicated that Plaintiff weighed 304 pounds and that the "incision [from her c-section was] healing" (Tr. 136).

On July 18, 1994, Plaintiff complained of low back pain (Tr. 136). Dr. Shipe reported that Plaintiff weighed 331 pounds, her gait was antalgic, straight-leg-raising was negative for radicular symptoms bilaterally, and deep tendon reflexes were symmetrical (Tr. 136). Plaintiff also complained of paresthesias in her right hand (Tr. 136). Dr.

Shipe's impression was possible carpal tunnel syndrome, lumbar back sprain, and hypertension (Tr. 136). Dr. Shipe prescribed Plaintiff Monopril for hypertension (Tr. 136).

On May 23, 1995, Plaintiff saw Dr. Shipe and complained that she was extremely tired and coughing ever since she started taking Monopril (Tr. 135). Dr. Shipe instructed Plaintiff to lose weight, discontinued her use of Monopril, and placed her on Ziac for her hypertension (Tr. 135). After evaluating her weight of 350 pounds, her blood pressure of 140/100, and her complaint of extreme tiredness, Dr. Shipe ordered a Thyroid Stimulation Hormone (TSH) test (Tr. 135).

On June 5, 1995, in response to the TSH test results, Dr. Shipe gave her a prescription of Synthroid at a dosage of 100mcg per day (Tr.135).[1] On August 21, 1995, Dr. Shipe increased Plaintiff's Synthroid dosage to 125mcg per day (Tr. 135). On November 6, 1995, Plaintiff weighed above 350 pounds (Tr. 134), and, on November 8, 1995, Dr. Shipe increased her Synthroid dosage to 150mcg per day (Tr. 134). On December 14, 1995, her Synthroid dosage was increased to 175mcg per day (Tr. 133).

On December 22, 1995, Plaintiff reported to Dr. Shipe that she continued to feel fatigued and was starting to develop slight hair on her face (Tr. 133). After finding persistent elevation of her TSH levels, despite the use of thyroid replacement medication, Dr. Shipe recommended an endocrinology referral (Tr. 133).

On April 16, 1996, Plaintiff saw Dr. Shipe for tonsillitis. She weighed above 350 pounds (Tr. 133).

---

[1] Synthroid (Levothyroxine) is used to treat hypothyroidism. Mayo Clinic, Levothyroxine (Oral Route), http://www.mayoclinic.com/health/drug-information/DR602749 (last visited July 30, 2009).

On June 6, 1996, Plaintiff weighed 342 pounds and asked to go on diet pills (Tr. 133). On July 2, 1996, Plaintiff reported significant improvement since being prescribed the diet pill Redux (Tr. 132). Plaintiff's Synthroid dosage for hypothyroidism was increased to 200mcg per day and her Ziac for hypertension was continued at its current dosage (Tr. 132).

By August 6, 1996, Plaintiff's weight was down to 331 pounds (Tr. 132). However, Plaintiff's prescription for Redux ran out, and by January 30, 1997, she gained all her weight back (Tr. 131).

On June 8, 1997, Plaintiff went to the emergency room at Cameron Memorial Community Hospital with complaints of facial swelling (Tr. 269–72). Plaintiff had four wisdom teeth pulled earlier in the week (Tr. 269, 271). Plaintiff's emergency room record noted that Plaintiff was currently taking Ziac and Synthroid and that she had a thyroid problem (Tr. 269). Dr. E. McEowen's impression was that Plaintiff suffered post dental extraction swelling and possible abscess (Tr. 271).

On January 22, 2008, Dr. Shipe noted that Plaintiff's weight was above 350 pounds (Tr. 130). Her prescriptions for Ziac and Synthroid were refilled (Tr. 130).

On December 1, 1998, Plaintiff's TSH level was normal. Dr. Shipe refilled Plaintiff's prescriptions of Synthroid and Ziac at a three month supply (Tr. 130). Dr. Shipe encourage Plaintiff to exercise and "go on a low cholesterol, low fat diet" (Tr. 130).

On December 3, 1998, Dr. Shipe prescribed Plaintiff Prilosec for acid reflux (Tr. 130).

On April 22, 1999, Plaintiff saw Dr. Shipe with complaints of difficulty breathing and a "choking type sensation" while laying down (Tr. 129). Plaintiff weighed over 350 pounds (Tr. 129). Dr. Shipe encouraged her to lose weight and concluded that Plaintiff might need a sleep study for obstructive sleep apnea (Tr. 129).

Dr. Shipe increased Plaintiff's dosage of Ziac on May 6, 1999 (Tr. 129).

On July 9, 1999, Plaintiff visited Dr. Shipe and complained that her left foot was swelling. In response, Dr. Shipe put Plaintiff on Tenoretic[2] (Tr. 129).

Plaintiff went to the emergency room at Cameron Memorial Community Hospital on July 18, 1999, complaining that she felt dizzy and lightheaded (Tr. 258–64). Plaintiff also reported "buzzing" in her right ear with some vertigo (Tr. 259). After a physical examination, Dr. Michael Holton opined that Plaintiff was grossly obese and appeared to have chronic anemia (Tr. 259–60). Dr. Holton concluded that Plaintiff's symptoms were most likely caused by a viral syndrome and instructed her to continue her current medications (Tr. 260).

After seeing Doctor Holton, Plaintiff saw Dr. Shipe on July 26, 1999, to discuss her anemia (Tr. 128). Dr. Shipe noted that Plaintiff weighed more than 350 pounds and could not be weighed on a scale (Tr. 128). He advised her to lose weight (Tr. 128).

Plaintiff saw Dr. Shipe on August 17, 1999, claiming that her heart would race in the afternoon (Tr. 128). Dr. Shipe believed that Plaintiff was wearing off her betablocker early (Tr. 128). Plaintiff still weighed over 350 pounds and could not be weighed on a scale (Tr. 128).

---

[2] Tenoretic (Atenolol and Chlorthalidone) is used to treat high blood pressure (hypertension). Atenolol is a beta-blocker that decreases blood pressure. Chlorthalidone is a water pill that is used to reduce the amount of water in the body. Mayo Clinic, Atenolol and Chlorthalidone (Oral Route), http://www.mayoclinic.com/health/drug-information/DR602451 (last visited July 30, 2009).

7

On August 19, 1999, Dr. Shipe noted that Plaintiff was still slightly anemic and advised to recheck Plaintiff's blood work (Tr. 128).

Plaintiff saw Dr. Shipe on January 3, 2000, and noted that Plaintiff had lost 65 pounds. However, Plaintiff could not be weighed on a scale, indicating that she still weighed above 350 pounds (Tr. 127). Dr. Shipe also noted that Plaintiff's TSH was high. Although Plaintiff was already taking Synthroid, Dr. Shipe put Plaintiff on a second thyroid medication, Levoxyl (Tr. 127).

In a February 22, 2005, letter, Dr. Shipe stated that Plaintiff had been his patient since 1985 and that she had years of multiple problems including high blood pressure, thyroid disease, depression, morbid obesity, and sleep apnea (Tr. 115).

On May 11, 2007, in response to Plaintiff's counsel's question, Dr. Shipe stated that he believed that Plaintiff has been unable to "engage in sedentary work, or any other work of a higher exertion, on a full time and sustained basis" (Tr. 244).

**(3)** *Plaintiff's Administrative Hearing*

On May 14, 2007, the ALJ convened a hearing in Fort Wayne at which Plaintiff appeared with her attorney Randal S. Forbes. Before directly examining Plaintiff, Forbes presented a summary of Plaintiff's medical condition. Forbes informed the ALJ that Plaintiff had been suffering from hypothyroidism, hypertension, anemia, and morbid obesity prior to December 31, 1999. Forbes indicated that during the same time period, Plaintiff had consistent leg swelling, which became so severe that veins in her legs burst. Forbes also claimed that Plaintiff attempted to work but could not sustain employment because of her medical impairments.

Plaintiff testified that throughout 1999 and for years prior, there was never a time where she could walk without pain. According to Plaintiff, her legs would swell after sitting for fifteen minutes. To counter the swelling, she needed to get up and walk around. However, she could never sit or stand in one place for a long period of time. In sum, Plaintiff testified that she could never get any work done because of excruciating leg pain.

Plaintiff also testified that, before December 31, 1999, the medication she was prescribed could not keep her thyroid under control. As a result, Plaintiff was always tired, had to take naps during the day, and could not drive. Plaintiff had to cook and wash dishes while seated.

As to her weight, Plaintiff testified that she was not always a large woman. She claimed that she was a skinny child and that "it was after the thyroid disease [when she] ballooned up" (Tr. 287).

Finally, Plaintiff testified about her attempt to be a substitute teacher in October through December 1999. According to Plaintiff, she had trouble walking into the school. She also could not stand at the chalkboard for the period of time that her job demanded and had trouble walking students to different rooms. As a result, the school let her go.

**(4)** *The ALJ's Decision*

The ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act. Although the ALJ decided that Plaintiff had medically determinable impairments of depression, sleep apnea, acid reflux, and restless leg syndrome, he concluded that Plaintiff did not have a severe impairment or combination of impairments.

9

In support of this conclusion, the ALJ stated that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible.

The ALJ went on to note that the evidence did not establish that Plaintiff's ability to work was limited by a disabling condition before December 31, 1999, Plaintiff's date last insured. In support of this finding, the ALJ briefly discussed Plaintiff's treatments at Cameron Memorial Community Hospital. The ALJ stated that Dr. Holton determined that a viral syndrome caused Plaintiff's dizziness and lightheadedness on July 18, 1999. The ALJ also noted Dr. McEowen's opinion that Plaintiff's facial swelling on June 8, 1997, was due to post dental extraction.

The ALJ also supported his conclusion that Plaintiff did not have a severe impairment by citing several of Dr. Shipe's treatment notes. The ALJ referenced Dr. Shipe's August 19, 1999, treatment note, stating that Plaintiff was slightly anemic. The ALJ also referenced Dr. Shipe's July 26, 1999, treatment note where he indicated that Plaintiff was too heavy to be weighed on a scale and that Plaintiff's dizziness and lightheadedness had totally resolved. On the basis of these treatment notes, the ALJ concluded that Plaintiff did not have a disabling condition that limited her ability to work before December 31, 1999.

Finally, the ALJ found that Plaintiff's medically determinable mental impairment was not severe because Plaintiff had not experienced episodes of decompensation and her mental impairment caused no more than a mild limitation in the areas of daily living, social functioning, and concentration, persistence, and pace.

**C. Standard of Review**

The Social Security Act authorizes judicial review of final decisions made by the Social Security Agency. 42 U.S.C. § 405(g). Upon judicial review, the court will only consider whether the ALJ's findings are supported by substantial evidence and made under the correct legal standard. *See Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). In issuing his opinion, the ALJ must, at minimum, state his analysis of the evidence so a reviewing court can make an accurate decision. *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Although an ALJ is not required to address all the evidence, "the ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881 (7th Cir. 2001). The ALJ must build an "accurate and logical bridge from the evidence to his conclusion so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004). In determining whether the ALJ has satisfied this burden, the court will not re-weigh evidence or make decisions of credibility. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005).

**D. Disability Standard**

To qualify for Disability Insurance Benefits the claimant must establish that he or she suffers from a disability. A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Administration established a five step inquiry to evaluate whether a claimant qualifies for disability benefits. A successful claimant must show:

> (1) he is not presently employed; (2) his impairment is
> severe; (3) his impairment is listed or equal to a listing in
> 20 C.F.R. § 404, Subpart P, Appendix 1; (4) he is not able
> to perform his past relevant work; and (5) he is unable to
> perform any other work within the national and local
> economy.

*Scheck v. Barnhart*, 357 F.3d 697, 699–700 (7th Cir. 2004). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski*, 245 F.3d at 886. A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

**E. Analysis**

Plaintiff claims that the ALJ erred by finding that she was not disabled within the meaning of the Social Security Act and denying Disability Insurance Benefits and Supplemental Security Income Benefits. Plaintiff asserts the following arguments in support of her claim: (1) the ALJ failed to properly give controlling weight to the opinion of Plaintiff's treating physician, Dr. Terry L. Shipe; (2) the ALJ erred in failing to find that Plaintiff's hypothyroidism, hypertension, and morbid obesity were medically determinable impairments; and (3) the ALJ erred in failing to conduct a step five analysis to determine whether Plaintiff was capable of performing other work existing in the national and local economy. The Court will address each of Plaintiff's arguments in turn.

**(1)** *Dr. Shipe's Opinion*

Plaintiff first argues that the ALJ failed to give controlling weight to the opinion of Plaintiff's treating physician, Dr. Terry L. Shipe. A treating physician's opinion regarding the nature and severity of a claimant's impairment is normally given controlling weight if it is "'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and is consistent with substantial evidence in the record." *Moss v. Astrue*, 555 F.3d 556, 560 (7th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)). However, a treating physician's opinion is not entitled to controlling weight if well-supported contradicting evidence is introduced. *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008); *see also* SSR 96-2p. An ALJ may also discredit a treating physician's opinion if it is internally inconsistent or based only on the patient's subjective complaints. *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008). But, an ALJ must always give specific reasons in the notice of determination or decision for the weight assigned to the treating source's medical opinion. SSR 96-2p; *see also* 20 C.F.R. §§ 404.1527(d)(2), 416.927.

In the present case, Dr. Shipe concluded, on the basis of the nature and severity of Plaintiff's impairments, that Plaintiff was unable to engage in sustained and full time sedentary work since about 1996. However, the ALJ determined, contrary to Dr. Shipe's opinion, that Plaintiff did not have a severe impairment or combination of impairments. Yet, in support of this conclusion, the ALJ not only failed to provide specific reasons for the weight assigned to Dr. Shipe's opinion, he failed to state what weight, if any, he gave to Dr. Shipe's opinion.

Defendant argues that this error was harmless because Dr. Shipe merely expressed his opinion by writing "yes" next to questions that Plaintiff's attorney prepared.

Defendant claims that the present case is analogous to *Dixon v. Massanari*, 270 F.3d 1171 (7th Cir. 2001). The Court disagrees. In *Dixon*, the court determined that the ALJ reasonably rejected the treating physician's opinion where the physician expressed the opinion by writing "yes" to a pre-typed question without further explanation. *Id.* However, the ALJ's decision in *Dixon* not to give the treating physician's opinion controlling weight was largely based on the ALJ's belief that the treating physician "was not completely objective—that she gave [the claimant] the benefit of the doubt whenever possible." *Id.* The ALJ in the present case did not express such a view of Dr. Shipe—or provide any reason to discredit his opinion.

Accordingly, the ALJ's decision must be remanded for further clarification on the issue of the weight accorded to Dr. Shipe's medical opinion.

**(2)** *Medically Determinable Impairments*

Plaintiff next argues that the ALJ erred in failing to find that hypothyroidism, hypertension, and morbid obesity were medically determinable impairments.

An ALJ may conclude that a claimant is disabled only if the claimant has a medically determinable impairment. 20 C.F.R. §§ 404.1505, 416.905. A medically determinable impairment "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques," and "must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms." 20. C.F.R. §§ 404.1508, 416.908. Evidence establishing a medically determinable impairment must come from acceptable medical sources such as licensed physicians,

psychologists, or similar professional medical care providers. *Id* ., §§ 404.1513(a), 416.913(a).

In this case, Plaintiff asserted that she suffered from years of hypothyroidism, hypertension, and morbid obesity. Dr. Shipe's treatment notes reflect treating Plaintiff for each of these impairments. Dr. Shipe continuously monitored Plaintiff's hypothyroidism and hypertension by checking her blood pressure, TSH levels, and weight. Futhermore, Plaintiff was prescribed Monopril for hypertension on July 18, 1994. On May 23, 1995, Dr. Shipe instructed Plaintiff to stop taking Monopril and, instead, placed her on Ziac. On June 5, 1995, Dr. Shipe prescribed Plaintiff Synthroid for hypothyroidism. Plaintiff remained on Ziac and Synthroid through December 31, 1999. On January 3, 2000, Dr. Shipe noted that Plaintiff's TSH was high. Although Plaintiff was already on Synthroid, Dr. Shipe put Plaintiff on a second thyroid medication, Levoxyl. According to Dr. Shipe's treatment notes, Plaintiff's weight never fell below 330 pounds from July 18, 1994, through January 3, 2000. As Dr. Shipe's treatment note on January 3, 2000, indicates, Plaintiff's weight had actually reached above 400 pounds.[3]

Despite this evidence, the ALJ concluded that Plaintiff's only medically determinable impairments were depression, sleep apnea, acid reflux, and restless leg syndrome. There is no mention of hypothyroidism anywhere in the ALJ's decision. Although the ALJ's decision once mentions hypertension and Plaintiff's weight, his decision does not even include a minimal discussion addressing hypertension and morbid obesity.

---

[3] Dr. Shipe's treatment note on January 3, 2000, indicated that Plaintiff, weighing above 350 pounds at the time (unable to weigh on scales), had lost 65 pounds.

The ALJ appears to have attempted to discount hypothyroidism and hypertension as impairments by linking Plaintiff's symptoms on two dates to other causes. He explains that Plaintiff's dizziness and lightheadedness on July 18, 1999, were caused by a viral syndrome and that her facial swelling on June 8, 1997, was due to post dental extraction. But evidence that Plaintiff had symptoms on two dates caused by something other than hypothyroidism and hypertension is not substantial evidence contradicting more than four years of Dr. Shipe's treatment notes documenting Plaintiff's history of hypothyroidism and hypertension. Furthermore, Cameron Memorial Community Hospital's emergency room records on these dates indicate that Plaintiff had a medical history of hypertension and thyroid disease.

The ALJ also did not point to any evidence contradicting Plaintiff's contention that she suffered from morbid obesity. Dr. Shipe's treatment notes documenting Plaintiff's obesity speak for themselves. Dr. Holton noted that she was grossly obese on July 18, 1999. Because the ALJ failed to indicate substantial evidence contradicting Plaintiff's claims of hypothyroidism, hypertension, and morbid obesity, the Court cannot accept the ALJ's conclusion that they were not medically determinable impairments.

Therefore, the case must be remanded for a proper assessment of whether hypothyroidism, hypertension, and morbid obesity are medically determinable impairments. If so, the ALJ must consider whether these impairments are severe within the meaning of the Social Security Act and their limitations, if any, on Plaintiff's Residual Functional Capacity.

**(3)** *Failure to Conduct a Step Five Analysis*

Plaintiff last argues that the ALJ erred in failing to conduct the fifth step of the sequential analysis to determine whether Plaintiff was capable of performing other work existing in the national and local economy.

Insofar as the ALJ determined at step two of the sequential analysis that Plaintiff was not disabled, he properly ended his evaluation.

Accordingly, on remand, whether the ALJ goes through all the steps depends on what he determines at each step.

**F. Conclusion**

The Court REMANDS the case to the ALJ for further consideration as stated in this Opinion and Order.

SO ORDERED on September 1, 2009.

__s/ Joseph S. Van Bokkelen_____
JOSEPH S. VAN BOKKELEN
UNITED STATES DISTRICT JUDGE
HAMMOND DIVISION